The STATE of Utah, Plaintiff
and Respondent,

v.

John F. GREEN, Defendant
and Appellant.

No. 18018.

Supreme Court of Utah.

Oct. 18, 1983.

David K. Smith, Salt Lake City, for defendant and appellant.

David L. Wilkinson, Atty. Gen., Earl Dorius, Asst. Atty. Gen., Salt Lake City, for plaintiff and respondent.

HOWE, Justice:

This is an appeal by the defendant John F. Green from a conviction by a jury of issuing a bad check in violation of U.C.A., 1953, § 76–6–505.

On February 24, 1981 the defendant and his wife, LaRue Green, entered the branch office of United Savings & Loan Company in West Jordan, Utah shortly before closing time for the purpose of opening a $10,000 savings account. He wrote a check for that amount drawn on the Greens' checking account at the West Jordan branch of the Draper Bank & Trust Company. They were given a $10,000 money market certificate which would mature in six months.[1]

The following day, shortly after noon, the defendant returned to United, and according to the testimony of the only two employees who talked to him he asked to "cancel or close" the certificate.[2] Although United still had the check in its office and had not yet deposited it in its account, it refused his request unless he would pay a penalty of six months' interest on the $10,-000. Defendant declined to agree to payment of the penalty and left the premises to talk to his wife. He soon returned with her and they requested to talk to United's manager. The manager, too, denied their request unless they would pay the penalty. She did, however, offer to call the main office of United to ascertain if the penalty could be waived. The Greens thereupon left United without resolving the matter. Shortly thereafter, employees of United telephoned the Draper bank and were told that the Greens' account on which the check was drawn had been closed at about noon that day. United then voided its copy of the certificate and a few days later it presented the check to Draper Bank where it was stamped "account closed" and returned unpaid to United. When the defendant closed his bank account it had a balance of only $6.28, and a check for $10,-000 would not have cleared at any time subsequent to November 5, 1980. The defendant testified that when he wrote the check he was expecting payment due him of

---

1. They were also given a gift certificate but it was not introduced into evidence. Hence we have no information as to its nature or whether it had any value. We note that some "gift certificates" only provide a discount on the purchase of a product which the donee may not wish to purchase.

2. The dissent states that he requested to "cash" the certificate. This was the testimony of a teller who was leaving for lunch who overheard part of the defendant's conversation with another teller who waited on him. However, the latter and the manager both testified that he wanted to "cancel or close" the certificate. In any event, that difference in testimony is inconsequential since the certificate could not be cashed under United's policy.

a draft the next day, which money he would use to cover the check. He also claimed that he had sufficient money in another account to cover the check but that later he changed his mind about purchasing the certificate and did not make the necessary transfer of funds.

Section 76–6–505(1) under which the defendant was convicted provides:

(1) Any person who issues or passes a check for the payment of money, for the purpose of obtaining ... any money, property, or other thing of value ... knowing it will not be paid by the drawee and payment is refused by the drawee, is guilty of issuing a bad check.

In accordance, the trial court instructed the jury that before they could convict the defendant they would have to find, among other things, that he "issued said check for the purpose of obtaining money, property or other thing of value from United Savings." The State completely failed to produce any evidence which would satisfy this requirement and the conviction of the defendant must be reversed.

The undisputed evidence is that the defendant did not write the check for the purpose of obtaining from United any money, property or other thing of value belonging to United. It was not intended by either United or the defendant that United would give him anything for his check. It was their intention that the defendant open a savings account in his own name with his own money. The check was written for the purpose of transferring the funds from the defendant's bank account to the new account established at United. The money market certificate was nothing more than a receipt for his own funds (not United's) which he intended to deposit but later changed his mind and did not deposit. The certificate itself had no value until the check creating the deposit cleared the bank upon which it was drawn and a deposit in United came into being. Before that happened, the defendant aborted the transfer of funds by closing the bank account and by failing to deposit funds sufficient therein to cover the $10,000 check. Thus no deposit in

United Savings was ever established and the certificate remained a nullity.

Representatives of United Savings testified that the certificate issued to the defendant was not negotiable and could not be redeemed, cashed or borrowed against until the check creating the deposit had cleared the bank upon which it was drawn and defendant's funds were in United's possession, which normally took seven days. Thus United did not part with anything of value which it owned when it issued the certificate. It only failed to acquire defendant's account and deposit in its institution. Under these circumstances, it cannot be said that the defendant issued his check for the purpose of obtaining any money, property or thing of value from United. An essential element of the crime was missing.

There is no claim made by the State that the defendant attempted to make any use of the certificate. United did not incur any liability on the certificate, including any liability to pay interest thereon. Because of its policy of waiting until the depositor's check cleared before honoring the certificate, United was never at any risk. Our statute simply does not make it a crime for a person to write a bad check on one account and deposit it to another account of his where the "deposit" is not and could not be drawn against until the check has cleared. This case involves nothing more than the defendant writing himself a worthless check.

The conviction and sentence of the defendant is reversed.

STEWART, OAKS and DURHAM, JJ., concur.

HALL, Chief Justice (dissenting):

I do not join the opinion of the Court because, in my view, it invades the province of the jury, whose prerogative it is to determine the facts. The Court repeatedly asserts as fact that United "did not part" with anything of value. However, this is but an *ipse dixit* in light of the contrary conclusion reached by the jury.

The well-recognized rules of appellate review require us to view the record in the light most favorable to the jury verdict. When so viewed, the record before us supports the following factual synopsis.

On February 24, 1981, just prior to closing time of 6:00 p.m., defendant purchased from United Savings & Loan Association (United) a $10,000 money market certificate to mature in six months. He paid for the certificate with his personal check in the amount of $10,000, drawn on the Draper Bank & Trust (bank).

The following day, at 12:45 p.m., defendant returned to United and sought not to "cancel or close" the certificate, but to *surrender the certificate for cash.* This prompted United's teller to advise that early withdrawal of the funds required the assessment of an interest penalty. Defendant expressed dissatisfaction with the penalty, stating that he had a note which had come due and that he was in need of all of the money to pay it off.[1] Defendant then departed without resolving the matter. He returned in a few minutes, at which time he sought out United's manager and had a similar discussion about the penalty to be applied in the event of early withdrawal. At that time, defendant advised the manager that he had expected to receive some additional funds that morning which had not materialized. Again defendant left without resolving the matter and without requesting the return of his check.

United's teller and manager discussed the variances in defendant's statements about his financial affairs and then called the drawee bank, whereupon they were informed that the account was closed. They thereafter presented the check for payment and it was returned, marked "account closed." Defendant closed the account at noon on February 25, after verifying to the bank that there were no outstanding checks to be paid. At that time, the account reflected a balance of only $6.28, and a check for $10,000 would not have cleared any time subsequent to November 5, 1980.

Defendant defended on the theory that it was his intention to cover the check upon its presentation for payment and that he simply wanted to cancel the transaction because, overnight, he had changed his mind about the purchase of the certificate, desiring instead to invest the funds in diamonds.

In his opening statement, defense counsel represented that the evidence would show that defendant had the financial ability and that he in fact intended to cover the check. This prompted a discussion with the court outside the presence of the jury, at which time defense counsel took the position that defendant was entitled to present evidence of his accounts with other financial institutions in order to dispel any intent to defraud. Counsel for the State lodged an objection to such evidence on the grounds of relevancy and asserted that the State had no burden to prove intent to defraud, but only that defendant passed a check "knowing it would not be paid," as expressly set forth in the statute.[2] The trial judge agreed, but withheld his ruling on the objection, stating, "If the evidence comes in that way, I'll make a ruling on it at that time . . . ."

At trial, defendant testified that it was his intention to cover the check with the funds he expected to receive the following morning in payment of a debt, and although the funds were not received, he had other funds with which to cover the check. Later on in his testimony, he again stated that although he did not receive the expected funds, he had "another way in which to cover the check." However, he stopped short of testifying that it was ever his intention to cover the check with funds from such other sources.

Defense counsel called two witnesses for the purpose of establishing that defendant had accounts at Cottonwood Thrift & Loan and at FMA Thrift & Loan. The State

---

1. Had it been defendant's intention only to "cancel or close" the certificate as is surmised by the Court, surely there would have been no discussion of a penalty for early withdrawal.

2. U.C.A., 1953, § 76–6–505(1).

renewed its objection on the grounds of relevancy. The trial judge sustained the objection on grounds of relevancy and foundation and declined to permit the witnesses to testify.

On appeal, defendant urges three points of error: (1) the court's refusal to permit the presentation of evidence of defendant's accounts with other financial institutions; (2) the court's refusal to give requested jury instructions bearing upon the subject of intent to defraud; and (3) insufficiency of the evidence on the element of consideration or value.

The essential elements of the offense of issuing a bad check as charged in the instant case are that: (1) a check be issued for the payment of a sum in excess of $1,000; (2) the check be issued for the purpose of obtaining money, property, or other thing of value; (3) the check be issued knowing that it will not be paid; and (4) payment of the check is refused by the drawee.

The trial court appropriately included each of the foregoing elements of the offense in its instructions to the jury. Defendant's contention that "intention to defraud" is also an essential element of the offense is not well-founded. While it is true that intent to defraud was an essential element of the offense under the former statute,[3] under the currently revised statute, § 76–6–505, *supra,* the gravamen of the offense is the issuance of a check "knowing it will not be paid."[4] In any event, the evidence offered by defendant was without relevance to the issues and was offered without foundation.

As the evidence came in, the only affirmative evidence offered of defendant's intention to cover the check came from his own testimony that he intended to cover it with the nebulous funds he expected on the following morning. When these funds were not forthcoming, he offered no evidence of any further intention he had to cover the check. Therefore, evidence of the fact that he may have been able to demonstrate some other ability to cover the check was clearly irrelevant. The evidence offered would have shown nothing more than the fact that defendant had other assets, not that he had any intention to utilize them to prevent the check from being dishonored. Thus, the trial court was well within its prerogative to preclude the presentation of such evidence on the grounds stated.

Although the other witnesses were not permitted to testify as to defendant's other accounts, defendant himself testified that even though he did not receive the funds expected on the morning of February 25, he nevertheless had "another way in which to cover the check," and that he had "other funds with which to cover the deposit or the check of $10,000."

Furthermore, notwithstanding the propriety of the trial judge's rulings on the evidentiary and jury instruction issues, in his closing argument to the jury defense counsel was afforded wide latitude to argue his theories of the case. He argued that defendant obtained nothing of value in return for his check because the money market certificate was not freely negotiable. He argued that no money changed hands, that defendant had no intention to obtain money, and that he only wanted to cancel, and not cash, the certificate because he had changed his mind.

He further argued that defendant had no culpable intent and had no intent to cheat or defraud United of $10,000, but simply changed his mind because of two things: (1) a desire to invest in diamonds, and (2) the money he was expecting did not materialize.

As was its prerogative, the jury chose not to believe defendant's explanation of his intentions. Rather, as was also its prerogative, the jury chose to believe the substantial, believable evidence that defendant issued the check knowing that it would not be paid on presentment.

---

**3.** U.C.A., 1953, § 76–20–11, so interpreted in *State v. Coleman,* 17 Utah 2d 166, 406 P.2d 308 (1965).

**4.** *State v. Delmotte,* Utah, 665 P.2d 1314 (1983).

In regard to defendant's remaining contention of error, that he obtained nothing in return for his bad check, the money market certificate was "property, or other thing" of value within the contemplation of § 76–6–505 if for no other reason than its value as collateral for a loan, to which defendant himself testified. However, in addition thereto, the evidence was that the certificate was negotiable for cash at United or any of its branches and that in fact defendant attempted to cash it. Also, defendant himself testified that in return for his $10,000 check he immediately received not only the money market certificate, but the gift certificates United gave as incentive for a $10,000 deposit. The exact value of those certificates is not in evidence, but it is unimportant. The degree of the crime is determined by the amount of the bad check, not the value obtained for it.[5]

I would affirm the jury conviction and the judgment of the trial court.